| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in compliance with D.N.J. LBR 9004-2(c)**<br>**FOX ROTHSCHILD LLP**<br>(Formed in the Commonwealth of Pennsylvania)<br>Michael J. Viscount, Jr., Esquire<br>Joshua T. Klein, Esquire<br>John H. Strock, Esquire<br>Marie C. Dooley, Esquire<br>1301 Atlantic Avenue, Suite 400<br>Atlantic City, NJ 08401<br>(609) 348-4515/fax (609) 348-6834<br>mviscount@foxrothschild.com<br>jklein@foxrothschild.com<br>jstrock@foxrothschild.com<br>mdooley@foxrothschild.com<br><br>*Proposed Counsel to the Debtor and*<br>*Debtor in Possession* |
| In re:<br><br>GASPARI NUTRITION, INC.,<br><br>Debtor.[1] |

Chapter 11

Case No. 14-

# DECLARATION OF MARC ROSS IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

I, Marc Ross, pursuant to 28 U.S.C. § 1746 hereby declare that the following is true and correct to the best of my knowledge:

1.  On October 14, 2014 ( the "Petition Date"), Gaspari Nutrition, Inc. (the "Debtor" or "Company") filed a voluntary petition for relief under chapter 11 of Title 11 of the United

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is: Gaspari Nutrition, Inc. (5842). The location of the Debtor's corporate headquarters is 575 Prospect Street, Suite 230, Lakewood, NJ 08701.

States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), commencing the above-captioned chapter 11 case (the "Chapter 11 Case").

2.  The Debtor continues to operate its business as debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. To date, no official committee or examiner has been appointed by the office of the United States Trustee in the Chapter 11 Case.

3.  I am currently the Debtor's Chief Restructuring Officer ("CRO").

4.  I have been a corporate restructuring and turnaround expert for over 14 years. In my capacity of a turnaround professional, I have served as an officer, and advisor to numerous distressed companies, as well as other parties in interest, including secured creditors and committee of unsecured creditors. My work involves managing all aspects of the financial restructuring process including, but not limited to, developing business plans, performing valuations, raising capital, asset dispositions/sales, and structuring and negotiating plans of reorganization. I have personally been involved in approximately 25 company-side restructuring transactions through my career.

5.  I submit this declaration (the "Declaration") to assist the Court and other parties-in-interest in understanding the Debtor's business, the events and circumstances leading to the commencement of the Chapter 11 Case, and certain facts in support of the first day motions and applications (collectively, the "First Day Motions") filed by the Debtor on the date hereof.

6.  Except as otherwise indicated, all facts set forth in the Declaration are based on my personal knowledge, information provided by certain of the Debtor's employees and professionals, my review of relevant documents, or my opinion based on my experience, knowledge and information concerning the Debtor's operations and financial affairs.

7.  If called to testify, I could testify competently on the facts contained herein.

8. I am authorized to submit the Declaration on behalf of the Debtor.

## I. THE COMPANY'S BACKGROUND

9. Incorporated in 2004 by Rich Gaspari (known professionally as the "Dragon Slayer"), the Company is a leading developer and distributor of sports nutrition supplements. Mr. Gaspari is a member of the International Federation of Bodybuilding and Fitness Hall of Fame, the recipient of the 2013 Arnold Schwarzenegger Lifetime Achievement Award, and winner of 13 amateur and professional bodybuilding titles (including Mr. America, Mr. Universe and Professional Mr. World). He also holds a certification from the National Academy of Sports Medicine. Over 18 years ago Mr. Gaspari began developing his own supplements and thereafter founded the Company. Since then, the Company has continued to develop products which make it an industry leader and one of the most sought after and recognizable supplement brands today.

10. The Company's products are primarily sold through third party specialty retailers such as The Vitamin Shoppe, through distributors, who sell to smaller sports nutrition retailers, and through specialty on-line retailers like BodyBuilding.com and Amazon.com. The Company also distributes its product through a proprietary website and directly to consumers through various subscription services.

11. The Company enjoys strong brand recognition featuring 17 distinct products which include the well-known and popular "Aminolast," "AminoMax," "Super Pump," and "MyoFusion Advanced" performance supplements. The Company's products have won several awards, including multiple "Product of the Year" awards from BodyBuilder.com, and are used by over 20 high profile athletes who compete as bodybuilders, mixed martial artists, and other strength and conditioning professionals.

12. Sales of the Company's products are projected to net approximately $45 million for 2014, and were as high as $78 million in calendar year 2011. The Company is confident it can successfully meet or exceed 2011 revenues numbers with enhanced operational efficiencies and consistent cash flow management.

## II. THE COMPANY'S PRE-PETITION EQUITY AND DEBT STRUCTURE

13. Mr. Gasperi is the Company's sole shareholder and its sole director.

14. Declining sales revenues over the previous three years, coupled with, significant litigation costs caused the Company to take on significant debt. As a result, the Company along with Crestmark Bank (the "Secured Lender") previously entered into financing arrangements (the "Pre-petition Loan") with Debtor and its principle, Mr. Gaspari as the guarantor, pursuant to, among others, the following documents (collectively, the "Pre-petition Loan Documents"):

   a. Promissory Note dated February 7, 2014, in the stated principal amount of $7,500,000.00, as amended by the Amended and Restated Promissory Note dated June 27, 2014 in the stated principal amount of $7,500,000.00 (the "Note");

   b. A Loan and Security Agreement and Schedule each dated February 11, 2014, as amended by Amendment No. 1 to Schedule to Loan and Security Agreement dated as of June 29, 2014, the Amendment No. 2 to Schedule to Loan and Security Agreement dated as of July 9, 2014, and letter agreements dated as of July 25, September 8 and September 16, 2014 (collectively the "Loan Agreement");

   c. A UCC-1 Financing Statement recorded on April 12, 2014 with the New Jersey Secretary of State, Filing Number 50722033;

   d. The Personal Guaranty dated as of February of 2014 (the "Guaranty") of Mr. Gaspari; and

   e. A pledge of marketable securities by Mr. Gaspari to secure his Guaranty.

15. In addition to the Pledge of marketable securities by Mr. Gaspari to secure his Guaranty[2], the Pre-petition Loan is secured by substantially all of the Debtor's assets, including all of the equipment, accounts and other tangible and intangible personal property as and to the extent described in the Pre-petition Loan Documents (the "<u>Pre-petition Collateral</u>").[3] As of the Petition Date, the most recent information provided to the Debtor by the Secured Lender states that the amount due on the Pre-petition Loan, including accrued interest and unpaid principal totals approximately $3,522,422 (the "<u>Pre-petition Secured Debt</u>").

16. According to the Debtor's books and records, as of the Petition Date, the Company owes approximately $12 million in unsecured debt. The Debtor's unsecured debt consists of trade debt and other debt arising from the operations of the Debtor's business, as well as several judgments.

17. On or about July 25, 2014, Secure Lender provided the Company notice that it was in default of the Pre-petition Loan Documents. After entering into the Pre-petition Loan with the Secured Lender, the Company's poor operating results continued during 2014 and resulting in the various violations of certain covenants of the Pre-petition Loan Documents with the Secured Lender. In late July 2014, as a condition to continued lending the Secured Lender and the Company agreed that the Company would hire (1) an investment banking firm to help bring new investment into the Company, and (2) the CRO to lead a financial and operational restructuring of the Company.

---

[2] Upon information and belief, the marketable securities pledged by Mr. Gaspari have been liquidated and that cash proceeds are now held in an account under the name of or otherwise controlled by the Secured Lender.

[3] Nothing contained herein shall be an admission by the Debtor that the Secured Lender holds a properly perfected security interest in any of the Debtor's assets. The Debtor expressly reserves all rights to challenge any lien, security interest, pledge, or guaranty asserted by the Secured Lender.

18. As a result of the Company's purported default on the Loan Agreement, I was installed as CRO to analyze the Company's financial and operational health, and to ultimately initiate a restructuring transaction or transactions.

## IV.  EVENTS LEADING TO THE CHAPTER 11 CASE

19. On or about July 23, 2014 the Debtor engaged Heritage Equity Partners ("Heritage") as its investment bankers to market the Debtor to find a partner for a potential sale, joint venture, or capital investment. Heritage immediately began marketing the Debtor for a potential transaction partner.

20. As noted above, the Debtor defaulted on the Loan Agreement which led to my installation as CRO. For the last two months, as Heritage's marketing process continued, I and, other members of the Debtor's management, along with Heritage, and the Debtor's other professionals facilitated due diligence with potential transaction partners and engaged in negotiation with parties who expressed interest in the Debtor. While Heritage was able to generate significantly interest in the Debtor, no potential buyer or investor was willing to consummate a transaction outside of chapter 11 that provided substantial likelihood of a timely closing.

21. However, the Debtor was able to reach an agreement with Body Temple, Ltd. for the purchase and sale of substantially all of the Debtor's assets (the "APA"). The APA contemplates the commencement of the Chapter 11 Case for the purpose of conducting a Court supervised secondary marketing effort, auction, and sale of the Debtor's assets subject to Bankruptcy Code section 363. Subject to Court approval, under the APA, Body Temple, Ltd. will be named the "stalking horse bidder" and thereby set a floor purchase price for the sale of

the Debtor's assets. A robust secondary marketing and auction process will maximize the value of the Debtor's estate for the benefit of all creditors.

V.      **FIRST DAY MOTIONS**

22.     Concurrently with the filing of its chapter 11 petition, the Debtor also filed the First Day Motions. The Debtor requests that the relief sought in each First Day Motion described herein be granted. The relief requested by each First Day Motion constitutes a critical element in preserving the value of the Debtor's estate for the benefit of all parties-in-interest.

A.      **Debtor's Motion for Order (i) Authorizing Continued Use of Existing (a) Cash Management System and Bank Accounts and (b) Business Forms; (ii) Authorizing Continued Post-Petition Intercompany Transactions; and (iii) Waiving Investment and Deposit Requirements**

23.     By the Cash Management Motion, the Debtor requests that the Court authorize the Debtor to have authority to continue to use the Debtor's existing Cash Management System, Bank Accounts, and business forms; and a waive certain investment and deposit requirements.

24.     In the Debtor's ordinary course, pre-petition, it utilized a cash management system that provided for the efficient collection and disbursement of funds (the "Cash Management System"). The Cash Management System consists of four bank accounts in the Debtor's name at PNC Bank, NA, and three bank accounts at TD Bank, NA. As of the Petition Date, the Debtor's accounts at TD Bank, NA did not hold any funds.

25.     The hub of the Cash Management System is the Debtor's operating account through which all incoming and outgoing funds must flow. The Debtor also has two additional operating accounts, one which specifically funds the Debtor's payroll and employee obligations to ADP, and a merchant processing account utilized for processing all customer transactions.

26. As part of its Cash Management System, the Debtor also utilizes numerous preprinted business forms and digitally generated and bank-certified graphic overlays (the "Business Forms") in the ordinary course of its business. The Debtor also maintains books and records to document, among other things, their profits and expenses (collectively, the "Books and Records"). To minimize expenses to the estate and avoid confusion on the part of employees, customers, vendors and suppliers during the pendency of the Chapter 11 Case, the Debtor requests that the Court authorize them to continue to use all correspondence and the Business Forms as such Business Forms were in existence immediately before the Petition Date—without reference to the Debtor's status as debtor-in-possession—rather than requiring the Debtor to incur the expense and delay of ordering entirely new Business Forms as required under the United States Trustee's Guidelines.

**B.  Debtor's Motion for Interim and Final Orders (i) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service to the Debtor, (ii) Deeming Utility Companies Adequately Assured of Future Payment and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance**

27. Pursuant to Bankruptcy Code section 366(b) the Debtor requests the entry of interim and final orders prohibiting Utility Providers from altering, refusing or discontinuing service to the Debtor; deeming the Utility Providers adequately assured of future payment; and establishing procedures for determining requests for additional adequate assurances of payment.

28. In connection with the operation of its business, the Debtor obtains gas, water, sewer, electric, waste removal, telephone, internet, and other similar utility services. Approximately eight utility providers (as such term is used in Bankruptcy Code section 366, collectively, the "Utility Providers") provide these services to the Debtor. The Debtor's estimated average monthly utility payment to the Utility Providers is approximately $5,766.72.

29. Uninterrupted utility services are essential to the Debtor's ongoing operations and, therefore, to the success of the Debtor's reorganization. The Debtor must be fully operational in order to meet the needs of their customers. Should the Utility Providers refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted. The impact on the Debtor's business operations could be extremely harmful and would jeopardize the Debtor's reorganization efforts. Consequently, it is critical that utility services continue uninterrupted.

        **i.**       **Proposed Adequate Assurance**

30. The Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Contemporaneously herewith, the Debtor has filed a motion seeking authority to use cash collateral and to borrow on a post-petition basis from the Secured Lender (the "Proposed DIP Facility").  The Debtor believes that the operating revenues and advances under the Proposed DIP Facility will be sufficient to pay such post-petition obligations to Utilities Providers.

31. To provide additional assurance of payment, the Debtor proposes to deposit with each Utility Provider an amount equal to 50% of the Debtor's estimated cost of monthly utility consumption with such Utility Provider. The Debtor's aggregate deposits with its Utility Providers will be approximately 2,883.36,[4] which represents an amount equal to two weeks of utility services, calculated based on the historical average over the twelve (12) months before the Petition Date (the "Adequate Assurance Deposit").

32. The Debtor submits that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future utility services in the ordinary course of business (collectively,

the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of Bankruptcy Code section 366.

### ii. Proposed Adequate Assurance Procedures

33. If a Utility Provider is not satisfied with the Proposed Adequate Assurance, any such Utility Provider may make requests for additional or different adequate assurance of future payment (each a "Request") pursuant to the Adequate Assurance Procedures (as defined below). The Adequate Assurance Procedures set forth a streamlined process to enable Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtor to continue its business operations uninterrupted. Specifically, the Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by filing and serving a Request upon the Notice Parties (as defined in the Adequate Assurance Procedures) within a specified period of time. The Debtor may then attempt to resolve any Request by mutual agreement with the Utility Provider and without further order by the Court. If the Request cannot be resolved, the Debtor requests the right to seek a hearing with the Court to resolve the Request.

### iii. Subsequent Modifications

34. To the extent that the Debtor subsequently identifies additional utility service providers, the Debtor seeks authority to amend the Utility Service List to add or remove any Utility Provider. Moreover, for those Utility Providers that are subsequently added to the Utility Service List, the Debtor will serve a copy of the Motion, along with the applicable portion of the amended Utility Service List and any related order on such Utility Provider. The Debtor requests that the terms of the order apply to any such subsequently identified Utility Provider and that any

such subsequently added Utility Provider who objects to the Proposed Adequate Assurance file a Request in accordance with the Adequate Assurance Procedures.

### C. Debtor's Motion for Authority to Pay Prepetition Wages, Compensation and Employee Benefits

35. Since January 2014, the Debtor has "leased" all of its employees (the "Employees") from ADP TotalSource, Inc. ("ADP"). While employed by ADP, the Employees remain under the supervision and direction of the Debtor's management at all times at the Debtor's facilities. The Debtor's management also controls the terms of the Employees' employment and makes all hiring decisions. The Client Services Agreement between the Debtor and ADP provides that ADP meet the Debtor's staffing needs while managing back-office human resources functions like payroll, health insurance, life insurance, workers' compensation insurance, 401(k) plan administration, and other employment related benefits.

36. By this employee benefit motion, pursuant to Bankruptcy Code sections 105(a) and 363(b), the Debtor requests entry of an order authorizing the Debtor to, in the ordinary course of its business pay any and all pre- and post-petition liabilities to the Employees ("Vacation Benefit Liabilities") under the Vacation Program (defined below) arising after the Petition Date in the ordinary course of business.

37. The Debtor also seeks to continue paying employee compensation in the ordinary course and to direct the banks at which the Debtor maintains employee-related accounts (for payments to ADP and for payment of any Vacation Benefit Liabilities and other Employee expenses) to receive, process, honor and pay all payroll and employee benefit related checks, drafts, wires or automated clearing house transfers, provided sufficient funds are available to honor all such payments, without regard to when the applicable payroll check was issued.

38.     Under the Client Services Agreement while ADP pays the employees' wages, payroll taxes, and most benefits, the Debtor is responsible for covering the costs of the employees' accrued vacation time (the "Vacation Program"). Under the Debtor's Employee vacation program, the Debtor is responsible for direct payment of accrued vacation time to an Employee in the event such employee's employment for the Debtor is terminated.

39.     While no employee is entitled to an amount of unpaid accrued vacation and other benefits or other expense reimbursements due greater than $12,475 in the aggregate, the Debtor has at least one employee termination pending and expects some Employees may opt to terminate their employment as a result of the commencement of the Chapter 11 Case. To that end, the Debtor requests authority to pay up to $25,000 aggregate accrued Vacation Benefit Liabilities to Employees who depart after the Petition Date, and also to honor health benefits and other pre-petition expense reimbursements due to employees employed as of the Petition Date. The Debtor further request authority to increase this amount on 10 days' negative notice to the Secured Lender, United States Trustee, and any official statutory committee formed in this case.

**D.     Debtor's Motion for Interim and Final Orders (a) Authorizing Debtor (i) to Modify the Existing Loan and Security Agreement to Allow for Post-Petition Access to Funds Thereunder; (ii) Granting Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. § 364; (iii) to Use Cash Collateral Pursuant to 11 U.S.C. § 363; and (B) Scheduling a Final Hearing and <u>Establishing Related Notice Requirements</u>**

40.     Prior to filing the Chapter 11 Case, the Debtor and the Secured Lender engaged in arm's-length negotiations which led to the parties working out the terms of a senior secured and superpriority debtor-in-possession financing facility (the "DIP Loan"). The Debtor seeks approval of the DIP Loan and entry of the Interim Order to authorize the modification of its pre-petition Loan and Security Agreement with the Secured Lender. Entry of the Interim Order will

allow the Debtor to access post-petition financing which will provide the Debtor with the liquidity necessary to operate through the pendency of the Chapter 11 Case. As more fully set forth in the DIP Motion, Interim Order, and DIP Documents, this post-petition financing transaction contemplated will essentially, subject to certain modifications, "carry-over" the terms and conditions of the Debtor's pre-petition Security and Loan Agreement with the Secured Lender and enforce the terms and conditions of that document post-petition. The Interim Order contemplates identical treatment of both pre- and post-petition borrowings by the Debtors.

41. The proposed DIP Loan does not "roll-up" any pre-petition debt. Instead, subject to the terms of the DIP Documents and the Interim Order, the Secured Lender seeks to enforce its pre-petition security interests post-petition with the same priority, force, and effect as such interests has prior to the Petition Date. While the Secured Lender does not seek to roll-up its pre-petition debt, it does seek authority to apply certain post-petition cash receipts to specific, corresponding pre-petition loans made on certain accounts to the Debtor. The Debtor expects that it will repay the DIP Loan upon the closing of the sale of its assets with a successful bidder.

42. The Debtor has an emergent need for access to the DIP Loan in order to meet its payroll obligations no later than October 16, 2014. Without immediate access to the DIP Loan the Debtor will not be able to meet its payroll obligations, thus causing immediate and irreparable harm to the Debtor and its employees.

43. With access to the liquidity provided by the DIP Loan, the Debtor will have the ability to maintain its business as a going concern, retain the ability to operate, maintain business relationships with vendors, suppliers, and customers, pay employees, and pursue a sale of the Debtor as a going concern in order to maximize value for its estate and creditors. Based on these

circumstances, the Debtor requires the access to the DIP Loan to avoid immediate and irreparable harm to its business, operations, and estate.

## VI.    CONCLUSION

44.    The Debtor's ultimate goal in the Chapter 11 Case is to achieve a sale of its assets that maximizes the value of the Debtor's estate for the benefit of all parties-in-interest. However, in the near term, the Debtor must minimize any loss of its enterprise value during the Chapter 11 Case, and, most critically, minimize disruption of the Debtor's business operations. The Debtor believes that if the Court grants the relief requested by the First Day Motions, the prospects for achieving these near term objectives and, in turn, the overall goal in the Chapter 11 Case will be substantially increased.

I declare under penalty of perjury inter the laws of the United States of America that the foregoing is true and correct.

Dated: October 14, 2014

/s/ Marc Ross
Marc Ross
Chief Restructuring Officer