| |
|---|
| UNITED STATES BANKRUPTCY COURT <br> DISTRICT OF NEW JERSEY <br> **Caption in compliance with D.N.J. LBR 9004-2(c)** <br> **FOX ROTHSCHILD LLP** <br> (Formed in the Commonwealth of Pennsylvania) <br> Michael J. Viscount, Jr., Esquire <br> Joshua T. Klein, Esquire <br> John H. Strock, Esquire <br> Marie C. Dooley, Esquire <br> 1301 Atlantic Avenue, Suite 400 <br> Atlantic City, NJ 08401 <br> (609) 348-4515/fax (609) 348-6834 <br> mviscount@foxrothschild.com <br> jklein@foxrothschild.com <br> jstrock@foxrothschild.com <br> mdooley@foxrothschild.com <br><br> *Proposed Counsel to the Debtor and Debtor in Possession* |
| In re: <br><br> GASPARI NUTRITION, INC., <br><br> Debtor.[1] |

Chapter 11

Case No. 14-

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTOR (I) TO MODIFY THE EXISTING LOAN AND SECURITY AGREEMENT TO ALLOW FOR POST-PETITION ACCESS TO FUNDS THEREUNDER; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. § 364; (III) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; AND (B) SCHEDULING A FINAL HEARING AND ESTABLISHING RELATED NOTICE REQUIREMENTS**

Gaspari Nutrition, Inc. (the "<u>Debtor</u>" or the "<u>Borrower</u>"), as a debtor and debtor-in-possession in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), hereby moves (the "<u>DIP Motion</u>"), pursuant to sections 105, 362, 363, 364, and 507 of Title 11 of the United States

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is: Gaspari Nutrition, Inc. (5842). The location of the Debtor's corporate headquarters is 575 Prospect Street, Suite 230, Lakewood, NJ 08701.

Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an interim order (the "Interim Order"), *inter alia*,

    (i) authorizing the Debtor to obtain secured post-petition financing on a superpriority basis (the "DIP Loan") pursuant to the terms and conditions of that certain Amended and Restated Schedule to Loan and Security Agreement to the Loan and Security Agreement dated February 11, 2014 (as amended, supplemented, restated, or otherwise modified from time to time, the "DIP Agreement") by and between the Debtor and Crestmark Bank (the "Secured Lender"), substantially in the form attached as Exhibit A to the Interim Order;

    (ii) authorizing the Debtor to execute and deliver the DIP Agreement and any other related credit documents (the "DIP Documents") by and between the Debtor and the Secured Lender, and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

    (iii) granting the DIP Loan and all obligations owing thereunder and under the DIP Documents to the Secured Lender (collectively, and including all "Obligations" or "Indebtedness" as defined in the DIP Agreement, the "DIP Obligations") allowed superpriority administrative expense claim status in the Chapter 11 Case;

    (iv) granting to the Secured Lender, automatically perfected security interests in and liens upon all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in Bankruptcy Code section 363(a);

    (v) authorizing and directing the Debtor to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, without limitation, closing fees and the reasonable fees and disbursements of the attorneys, advisors, accountants, and other consultants of the Secured Lender, all to the extent provided in and in accordance with the terms of the DIP Documents;

    (vi) authorizing the use of Cash Collateral of the Secured Lender under the Prepetition Loan Documents (each as defined herein), and providing adequate protection to the Secured Lender for any Diminution in Value of its interests in the Prepetition

27530103

2

    Collateral, including the Cash Collateral (each as defined herein);

    (vii) vacating and modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order; and

    (viii) scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and approval of the DIP Loan on a final basis and approving the form of notice with respect to the Final Hearing.

In support of the DIP Motion, the Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Debtor seeks the entry of the Interim Order to authorize the modification of its pre-petition Loan and Security Agreement with Crestmark Bank in order to obtain access to post-petition financing which will provide the Debtor with the liquidity necessary to operate through the pendency of the Chapter 11 Case. The post-petition financing transaction contemplated by the DIP Documents, DIP Motion, and Interim Order, will essentially, subject to certain modifications, "carry-over" the terms and conditions of the Debtor's pre-petition Security and Loan Agreement with the Secured Lender and enforce the terms and conditions of that document post-petition. Indeed, the Interim Order contemplates identical treatment of both pre- and post-petition borrowings by the Debtors.

2. It is important to recognize that the proposed DIP Loan *is not* a roll-up of the Debtor's pre-petition Debt. Instead, subject to the terms of the DIP Documents and the Interim Order, the Secured Lender seeks to enforce its pre-petition security interests post-petition with the same priority, force, and effect as such interests has prior to the Petition Date. While the Secured Lender *does not* seek to roll-up its pre-petition debt, it does seek authority to apply certain post-petition cash receipts to specific, corresponding pre-petition loans made on certain accounts to the Debtors.

27530103                                                          3

3. Further, the Debtor has an emergent need for access to the DIP Loan in order to meet its payroll obligations no later than October 16, 2014. Without immediate access to the DIP Loan the Debtor will not be able to meet its payroll obligations, thus causing immediate and irreparable harm to the Debtor and its employees.

4. With access to the liquidity provided by the DIP Loan, the Debtor will have the ability to maintain its business as a going concern, retain the ability to operate, maintain business relationships with vendors, suppliers, and customers, pay employees, and pursue a sale of the Debtor as a going concern in order to maximize value for its estate and creditors. By this motion, the Debtor will demonstrate that it meets the Bankruptcy Code's standards for approval of the proposed modification of the pre-petition loan agreement to allow for debtor-in-possession financing on the terms required by the DIP Loan. Accordingly, the DIP Motion should be approved.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

6. Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory predicate for the relief requested in this Motion are Bankruptcy Code sections 105, 362, 363, 364, and 507 and Bankruptcy Rules 2002, 4001 and 9014.

**BACKGROUND**

A. **The Chapter 11 Case**

8. On October 14, 2014 (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of New Jersey (the "Court").

9. Founded by accomplished bodybuilder Rich Gaspari, the Debtor is a leading developer and distributor of sports nutrition supplements. The Debtor's products are primarily sold through third party specialty retailers such as The Vitamin Shoppe and GNC, and through specialty on-line retailers like BodyBuilding.com, NutriLogic.com, and Vitacost.com. The Debtor also distributes its product through a proprietary website and directly to consumers through various subscription services.

10. The Debtor continues to operate its business and manage its financial affairs as debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

11. To date, no official committee or examiner has been appointed by the Office of the United States Trustee in the Chapter 11 Case.

12. Additional background facts on the Debtor, including an overview of the Debtor's business, information on the Debtor's debt structure, and information on the events leading up to the Chapter 11 Case is contained in the Declaration of Marc Ross in Support of First Day Motions and Applications filed contemporaneously herewith (the "Ross Declaration").

13. The Debtor commenced the Chapter 11 Case in order conduct a sale of its business as a going concern under Bankruptcy Code section 363.

**B.    The Pre-petition Debt**

14. The Secured Lender previously entered into financing arrangements (the "Pre-petition Loan") with Debtor and its principle, Mr. Gaspari as the guarantor, pursuant to, among others, the following documents (collectively, the "Pre-petition Loan Documents"):

   a. Promissory Note dated February 7, 2014, in the stated principal amount of $7,500,000.00, as amended by the Amended and Restated Promissory Note dated June 27, 2014 in the stated principal amount of $7,500,000.00 (the "Note");

   b. A Loan and Security Agreement and Schedule each dated February 11, 2014, as amended by Amendment No. 1 to Schedule to Loan and Security Agreement dated as of June 29, 2014, the Amendment No. 2 to Schedule to Loan and Security Agreement dated as of July 9, 2014, and letter agreements dated as of July 25, September 8 and September 16, 2014 (collectively the "Loan Agreement");

   c. The Personal Guaranty dated as of February of 2014 (the "Guaranty") of Richard S. Gaspari (the "Guarantor"); and

   d. A UCC-1 Financing Statement recorded on April 12, 2014 with the New Jersey Secretary of State, Filing Number 50722033.

15. The Pre-petition Loan is secured by substantially all of the Debtor's assets, including all of the equipment, accounts and other tangible and intangible personal property as and to the extent described in the Pre-petition Loan Documents (the "Pre-petition Collateral"). As of the Petition Date, the most recent information provided to the Debtor by the Secured Lender states that the amount due on the Pre-petition Loan, including accrued interest and unpaid principal totals approximately $3,522,422 (the "Pre-petition Secured Debt").

16. According to the Debtor's books and records, as of the Petition Date, the Company owes approximately $12,694,352.64 in unsecured debt. The Debtor's unsecured debt consists of trade debt and other debt arising from the operations of the Debtor's business, as well as several judgments.

**C.    The Need for Post-petition Financing**

17.    The Debtor filed Chapter 11 with the principal objective to reorganize through the sale its assets and business as a going concern under Bankruptcy Code section 363.  As a consequence of the factors described in the Ross Declaration, the Debtor has insufficient cash to maintain business relationships with their vendors, suppliers, customers and employees, and, in the event that any or all of those relationships are adversely affected by the commencement of this Case, the Debtor will most likely face the prospect of having insufficient cash to finance its operations, to pay its employees and to accomplish its goals for the Chapter 11 Case.

18.    The Debtor urgently needs credit and additional capital to mitigate any negative effects of this case and to continue business operations, and to complete the sale process.  Absent availability of new credit, the Debtor's business will be severely and negatively impacted, which will in turn severely and negatively impact the going concern value of the Debtor's assets.  Most critically, the Debtor requires immediate access to the DIP Loan in order to meet its payroll obligations no later than October 16, 2014.  Without the liquidity provided by the DIP Loan, the Debtor will be unable to meet its near-term payroll obligations, and the Debtor, and more importantly, its employees will suffer irreparable harm.

19.    Accordingly, the Debtor requires the immediate availability of working capital from the DIP Loan and the use of Cash Collateral.  The DIP Loan will instill a sense of confidence in the Debtor's employees, customers, vendors, and other parties-in-interest.  The Debtor critically needs the support of these critical parties at this time, as any loss of support could severely impair the Debtor's ability to maximize the value of its estate.

20.    In sum, without the immediate access to post-petition financing, the Debtor expects to suffer immediate and irreparable harm to its estate and creditors.  The Debtor's ability

to preserve the value of its estate for the benefit of its creditors depends upon the interim and final relief requested in this DIP Motion.

**D.    Summary of Proposed DIP Financing[2]**

21.    The Debtor has determined, in the exercise of its sound business judgment, that to meet their working capital needs they require a post-petition credit facility in substantially the form described herein.  Accordingly, subject to the Court's approval, the Debtor has determined to enter in the DIP Agreement with the Secured Lender.

22.    The terms of the DIP Loan are more specifically set forth in the DIP Agreement attached as Exhibit A to the Interim Order.  The key provisions of the DIP Agreement are as follows:

Lender:  Crestmark Bank

Borrower:  Gaspari Nutrition, Inc.

Authorized Borrowings.  The Secured Lender shall advance an amount such that the amount of outstanding pre- and post-petition indebtedness the Debtor owes the Secured Lender shall not exceed the lesser of:

    a.    Six Million Dollars ($6,000,000.00) ("Maximum Amount"); or

    b.    the sum of:

        i.    Eighty-five percent (85%) of domestic and foreign Post-Petition Eligible Accounts; PLUS

        ii.    Seventy-five percent (75%) of domestic Pre-Petition Date Eligible Accounts plus fifty percent (50%) of foreign Pre-Petition Date Eligible Accounts; Plus

---

[2] The summaries and descriptions of the terms and conditions of the DIP Agreement and the proposed Interim Order set forth in the DIP Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the DIP Agreement and the Interim Order.  In the event there is a conflict between the DIP Motion and the DIP Agreement or the Interim Order, the DIP Agreement and/or the Interim Order, as applicable, shall control in all respects.  Any capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

    iii.    the lesser of (x) Nine Hundred Thousand Dollars ($900,000.00), or (y) forty percent (40%) of Pre-Petition Eligible Raw Material Inventory not to exceed Three Hundred Sixty Thousand Dollars ($360,000.00) at any time, plus fifty-eight percent (58%) of Pre-Petition Eligible Finished Good Inventory not to exceed Five Hundred Forty Thousand Dollars ($540,000.00) at any time; PLUS

    iv.    up to one hundred percent (100%) of the dollar amount of Eligible Post-Petition Inventory Purchase Orders pursuant to a Crestmark approved budget; PLUS

    v.    One Million Eight Hundred Thousand Dollars ($1,800,000.00) held by Crestmark from the liquidation of certain marketable securities previously pledged to Crestmark by Richard Gaspari.

All borrowing by the Debtor will be in accordance with the Budget attached as Exhibit B to the Interim Order, until the Termination Date.

<u>Interest</u>: Secured Lender has the right to charge interest at a rate equal to 11% per annum in excess of the Wall Street Journal Prime Rate. As an accommodation to the Debtor, the Indebtedness (including the amounts advanced prior to and under the Interim Order and thereafter if the Interim Order becomes a Final Order) shall bear interest at a rate equal to 5.00% per annum in excess of the Prime Rate but not less than 8.25% per annum.

<u>Adequate Protection</u>: To secure the DIP Indebtedness (which includes that amount advanced under the Interim Order if it becomes a final order), and as adequate protection for and to protect the Secured Lender against any diminution in the value of the Pre-Petition Collateral, except as provided in the last sentence of this clause 3.1, the Secured Lender will be granted, pursuant to Bankruptcy Code section 364(c)(2) and 364(c)(3), a first lien on the Debtor's personal property of any kind and nature whatsoever, whether now owned or hereafter acquired by Debtor, and all proceeds, rents or profits thereof, including all of the Pre-Petition Collateral and any unused or unearned retainers, deposits, or prepaid items (collectively, the "<u>DIP Collateral</u>"), subject to any validly existing lien on personal property of the Debtor other than Accounts. Any pre-petition security interest or lien on the Pre-Petition Collateral which is avoided or otherwise preserved for the benefit of Debtor's estate under Section 551 or any other provisions of the Bankruptcy Code shall be subordinate to the security interests in favor of Secured Lender on the DIP Collateral. Notwithstanding anything contained herein to the contrary, the Interim Order does not afford Secured Lender a security interest in any Chapter 5 causes of action.

<u>DIP Lien Priority</u>. All liens and security interests in the DIP Collateral granted to Secured Lender by the Interim Order will be deemed duly perfected and recorded

under all applicable laws as of the date of entry, and no notice, filing, mortgage recordation, possession, further order or act shall be required to effect or continue such perfection, although Secured Lender may, in its sole discretion, and at Debtor's expense, make any filings or recordations or other acts it deems appropriate with respect to such perfection.

Superpriority Claim. The DIP Indebtedness shall have the highest administrative priority under Bankruptcy Code section 364(c)(1), and shall have priority over all other costs and expenses of administration, including those specified in, or ordered pursuant to, Bankruptcy Code sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provision or otherwise (whether incurred in this case, any conversion of this case pursuant to Bankruptcy Code section 1112 of the Bankruptcy Code, or in any other proceedings related hereto or thereto, a "Successor Case"). Notwithstanding anything contained herein to the contrary, the Interim Order does not afford Secured Lender a security interest in any Chapter 5 causes of action. Nothing in the Interim Order constitutes Secured Lender's consent to a collateral surcharge pursuant to Bankruptcy Code section 506(c). Notwithstanding the foregoing, Secured Lender's liens on and security interests in the DIP Collateral and Secured Lender's administrative claims under Bankruptcy Code section 364(c)(1) shall be subject to the payment of any unpaid fees payable pursuant to 28 U.S.C. §1930, any unpaid fees payable to the Clerk of this Court or the United States Trustee.

Application of Proceeds. All proceeds and collections of the Pre-Petition Collateral and the DIP Collateral, including the proceeds and collections of the receivables pledged to Secured Lender under this Interim Order, must be forwarded to the Blocked Account at Secured Lender. Secured Lender will be authorized to notify all Account Debtors to make all payments to the Blocked Account, to make collection calls and to institute collection action if necessary.

The proceeds of each Account (including those with respect to the Interim Order) that Secured Lender collects will be applied as follows:

    a.    *first, to Secured Lender in an amount equal to the Advance on that Account whether occurring prior to or after the Petition Date*;[3]

    b.    then to Secured Lender in an amount equal to the maintenance fee for that Account;

---

[3] While the Debtor does not believe that any "Extraordinary Provision" set forth in the Appendix to D.N.J. LBR 4001-4 is a component of the DIP Loan, out of an abundance of caution, the Debtor highlights this provision contained in paragraph 2.2 of the Interim Order. Here, the DIP Motion seeks the Court's authority not for cross-collateralization, but for the Secured Lender to apply payments received post-petition for specific Pre-Petition Indebtedness to the pre-petition balance of such Pre-Petition Indebtedness before applying such payments to the DIP Indebtedness.

27530103                         10

  c. then to Secured Lender in an amount equal to the interest earned on the Advance at the interest rate set forth herein;

  d. then to Secured Lender to pay any expenses Debtor owes to Secured Lender (subject only to a final, non-appealable Order that the expenses incurred and paid were unreasonable). The Secured Lender will provide the Debtor, the United States Trustee and any official committee copies of all its legal invoices and a breakdown of the other Bank Expenses;

  e. last, unless Secured Lender elects to withhold all or part of the funds in a reserve for repayment of questionable Accounts or unless there is a default hereunder, to Debtor.

<u>Remedies Upon Event of Default</u>. No delay or failure to exercise any right, power or remedy accruing to Secured Lender upon breach or default by Debtor under the Interim or Final Order or any document or agreement shall impair any such right, power or remedy of Secured Lender nor shall it be construed to be a waiver of any such breach or default, nor of any breach or default theretofore or thereafter occurring, nor an acquiescence thereof.

## REQUEST FOR APPROVAL OF THE DIP LOAN

23. As described above, it is essential to the success of the Chapter 11 Case that the Debtor immediately obtains access to sufficient post-petition financing, without which the Debtor's ability to maintain its business operations will be compromised. The Debtor's continuing ability to maximize the value of its estate for the benefit of its creditors, and its ability to pursue its proposed sale and auction depend heavily upon the expeditious approval of the DIP Loan and the related actions requested herein.

24. Bankruptcy Code section 364[4] distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of

---

[4] Section 364(c) of the Bankruptcy Code provides as follows:
If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
 (1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;
 (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
 (3) secured by a junior lien on property of the estate that is subject to a lien.
11 U.S.C. § 364(c).

27530103    11

business and (c) obtaining credit with specialized priority or with security. If a debtor cannot obtain post-petition credit on an unsecured basis, pursuant to Bankruptcy Code section 364(c), a court may authorize a debtor to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or combination of the foregoing. Pursuant to section Bankruptcy Code section 364(d),[5] a court may authorize a debtor to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is already subject to a lien.

25. As a condition to entering into the DIP Agreement and obtaining the Debtor's needed liquidity, the Debtor must obtain authorization, pursuant to Bankruptcy Code sections 364(c) and (d), (a) to grant the Secured Lender automatically perfected security interests in and liens upon all of the DIP Collateral, including, without limitation, all property constituting Cash Collateral, and (b) grant the DIP Obligations allowed Superpriority administrative expense claim status in the Chapter 11 Case and any potential Successor Case.

A.   **Approval Under Bankruptcy Code Section 364(c)**

26. The statutory requirement for obtaining post-petition credit under Bankruptcy Code section 364(c) is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense." *See In re Garland Corp.,* 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and hearing, upon showing that

---

[5] Section 364(d) of the Bankruptcy Code provides as follows:
(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
    (A) the trustee is unable to obtain such credit otherwise; and
    (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
11 U.S.C. § 364(d).

27530103                                                    12

unsecured credit cannot be obtained); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b)"); *In re Crouse Group, Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

      1.    <u>The Debtor Was Unable to Obtain Necessary Post-petition Financing on an Unsecured Basis Under Bankruptcy Code Sections 364(a) or (b)</u>

27.    As set forth in the Ross Affidavit, and as the evidence at the interim and final hearings will show, the Debtor could not have obtained a working capital facility of the type and magnitude required in the Chapter 11 Case on an unsecured basis.

28.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* at 1088; *see also Ames,* 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom*, *Anchor Savings Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

29. The Debtor submits that, other than the DIP Loan, there are no financing alternatives available under the circumstances. As the Court is undoubtedly aware, in the current economic environment, the financing options for a wide variety of companies, particularly those involved in sub-prime financing, are extremely limited.

30. Moreover, as noted above, virtually all of the Debtor's assets are encumbered by liens and security interests in favor of the Secured Lender. Alternative financing in an amount sufficient to repay the Secured Lender and provide additional liquidity is simply not available given the current state of the financial markets, the nature and state of the Debtor's business operations, and the size of the financing required. Even if alternative post-petition financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtor's liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Secured Lender, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtor, immediately jeopardizing the Chapter 11 Case.

    2. <u>The Post-petition Loan is Necessary to Preserve Assets of the Debtor's Estate</u>

31. As stated above, the DIP Loan is essential so that the Debtor can continue to purchase inventory, keep its operations running, and immediately instill employees, suppliers and customers with confidence in the Debtor's ability meet its obligations to these important stakeholders while it conducts an orderly sale process. Absent such confidence, the Debtor will not have the resources or support necessary to maintain operations and preserve its going concern value.

32. The success of the Chapter 11 Case depends on the confidence of the Debtor's employees, vendors, and customers. If the DIP Motion is denied or delayed, that confidence

may be destroyed, and the success of the Chapter 11 Case might be irreparably damaged. In contrast, once the DIP Loan is approved, the Debtor's ability to provide employees, vendors, customers, and other important stakeholders with the necessary confidence will be assured. The Debtor's need for access to the DIP Loan is, therefore, immediate.

        3.        <u>The Terms of the DIP Loan are Fair, Reasonable and Appropriate</u>

        33.        In the Debtor's considered business judgment, the DIP Loan is the best financing option available under the circumstances. The purpose of the post-petition financing is to enable the Debtor to maintain the value of its estate while pursuing a going concern sale of its business for the benefit of all stakeholders.

        34.        The proposed DIP Loan provides, generally, that the security interests and administrative expense claims granted to the Secured Lender are subject to, among other items, a the Carve Out for all statutory fees payable to the Clerk of the Court or the U.S. Trustee pursuant to 28 U.S.C. § 1930.

        4.        <u>Application of the Business Judgment Standard</u>

        35.        After appropriate and extensive investigations and analysis, and robust, good faith, and arm's length negotiations among the Debtor and the DIP Lender, the Debtor's management concluded that the DIP Loan and the use of Cash Collateral is the best alternative available in the circumstances of these cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.,* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment on behalf of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its

27530103                15

creditors"); *In re TM Carlton House Partners, LTD,* 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts); *cf. Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.,* 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus. Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

36. The Debtor has exercised sound business judgment in determining that a post-petition credit facility is appropriate and has satisfied the legal prerequisites to incur debt under the DIP Loan. The terms of the DIP Agreement are fair and reasonable and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted authority to enter into the DIP Agreement and obtain funds from the Secured Lender on the secured, administrative "superpriority" basis described above, pursuant to Bankruptcy Code sections 364(c) and (d).

**B**     **Request for Consensual Use of Cash Collateral**

37.     The Debtor will require the ability to use cash and the proceeds of existing accounts receivable and inventory to maintain the operation of their businesses and preserve their value as going concerns.  These essential items, however, constitute part of the Pre-petition Collateral (the "Cash Collateral") and, therefore, may not be used in support of the Debtor's ongoing business activities absent compliance with Bankruptcy Code section 363(c)(2), which provides as follows:

> (2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
> (A) each entity that has an interest in such cash collateral consents[.]

11 U.S.C. § 363(c)(2).

38.     In the instant case, the Secured Lender has consented to the Debtor's use of Cash Collateral.  As a result, and because the such use is essential to the preservation of the Debtor's estate, the Court should approve the Debtor's use of Cash Collateral under Bankruptcy Code section 363(c)(2).

39.     Pursuant to the Interim Order, all funds advanced by the Secured Lender to the Debtor after the Petition Date shall be deemed additional loans under the Pre-petition Loan Documents; therefore, adequate protection for the use of the Cash Collateral is not required as the security interests in post-petition advances will have the same priority, force, and effect as funds advanced pre-petition.

**C.**     **Good Faith**

40.     The Debtor submits that the terms and conditions of the DIP Loan, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtor under the

circumstances. As stated above, the Debtor and the Secured Lender negotiated the terms and conditions of the DIP Agreement and the use of Cash Collateral in good faith and at arm's length. Moreover, the Debtor's decision to enter into the DIP Agreement was an exercise of the Debtor's prudent business judgment. Therefore, the Secured Lender should be accorded the benefits of Bankruptcy Code section 364(e) to the extent any or all of the provisions of the DIP Agreements, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

### D. Request for Modification of the Automatic Stay

41. The Interim Order contemplates a modification of the automatic stay established pursuant to Bankruptcy Code section 362, to the extent necessary, to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to (a) permit the Debtor to grant the various protections to be afforded the Secured Lender contemplated herein; (b) permit the Debtor to perform such acts as the Secured Lender may request in its sole discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtor to incur all liabilities and obligations to the Secured Lender under the DIP Documents, the DIP Loan, and the Interim Order; and (d) authorize the Debtor to pay and the Secured Lender to retain and apply payments made in accordance with the terms of the Interim Order.

42. Stay modification provisions of this type are customary features of post-petition financing facilities and, in the Debtor's business judgment, are reasonable under the circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim Order.

27530103

18

## REQUEST FOR WAIVER OF STAY

43. In order to successfully implement the foregoing, the Debtor respectfully requests that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a), the 21 day stay provided for by Bankruptcy Rule 6003(b), and the 10 day stay provided for by Bankruptcy Rule 6004(h). The Debtor believes, for the reasons set forth above, that ample justification exists for the Court to waive Bankruptcy Rule 6003(b), 6004(a), and 6004(h).

## REQUEST FOR FINAL HEARING

44. Pursuant to Bankruptcy Rule 4001(c)(2), the Debtor requests the Court to set a date for the Final Hearing that is no later than 25 days from the Petition Date.

## NOTICE AND NO PRIOR REQUEST

45. Notice of the DIP Motion has been provided by the Debtor, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee; (ii) the creditors holding the 20 largest unsecured claims against the Debtor's estate; (iii) counsel to the Secured Lender; and (iv) any other entity or individual that has asserted a security interest or lien in any of the DIP Collateral. The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in the Interim Order.

46. No previous motion for the relief requested herein has been made to this or any other court.

[*Intentionally Left Blank*]

WHEREFORE, the Debtor respectfully requests that the Court (i) enter an order substantially in the form of the Interim Order attached as <u>Exhibit 1</u>; (ii) schedule the Final Hearing, (iii) after the Final Hearing, enter a Final Order substantially in the form of the Interim Order and as filed with the Court prior to the Final Hearing; and (iv) grant such other and further relief as is just and proper.

Dated:  October 14, 2014                                FOX ROTHSCHILD LLP

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

By:  _____/s/ Michael J. Viscount, Jr._____
     Michael J. Viscount, Jr., Esquire
     Joshua T. Klein, Esquire
     John H. Strock, Esquire
     Marie C. Dooley, Esquire