UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-2(c)**

**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Michael J. Viscount, Jr., Esquire
Joshua T. Klein, Esquire
John H. Strock, Esquire
Marie C. Dooley, Esquire
1301 Atlantic Avenue, Suite 400
Atlantic City, NJ 08401
(609) 348-4515/fax (609) 348-6834
mviscount@foxrothschild.com
jklein@foxrothschild.com
jstrock@foxrothschild.com
mdooley@foxrothschild.com

*Proposed Counsel to the Debtor and
Debtor in Possession*

| | |
|---|---|
| In re:<br><br>GASPARI NUTRITION, INC.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 14- |

## MOTION OF THE DEBTOR FOR (I) AN ORDER
## (A) APPROVING BIDDING PROCEDURES, INCLUDING BREAK-UP FEE AND
## EXPENSE REIMBURSEMENT; AND (B) SCHEDULING BID DEADLINE, AUCTION
## DATE, AND SALE HEARING AND APPROVING NOTICE THEREOF; AND (II) AN
## ORDER APPROVING (A) THE SALE OF THE DEBTOR'S ASSETS UNDER THE
## ASSET PURCHASE AGREEMENT FREE AND CLEAR OF LIENS, CLAIMS,
## CHARGES, ENCUMBRANCES AND INTERESTS AND (B) THE ASSUMPTION, SALE
## AND ASSIGNMENT TO BUYER OF CERTAIN CONTRACTS OF THE DEBTOR

Gaspari Nutrition, Inc. (the "<u>Debtor</u>" or the "<u>Company</u>"), as a debtor and debtor-in-

possession in the above-captioned case (the "<u>Case</u>"), hereby files this motion (the "<u>Motion</u>") for

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is:
Gaspari Nutrition, Inc. (    ).  The location of the Debtor's corporate headquarters is 575 Prospect Street, Suite 230,
Lakewood, NJ 08701.

(1) entry of an Order, in substantially the form attached as <u>Exhibit 1</u> hereto (the "<u>Bidding Procedures Order</u>"), (a) approving bidding procedures (the "<u>Bidding Procedures</u>") attached as <u>Exhibit A</u> to the Bidding Procedures Order, including the Break-Up Fee[2] and Expense Reimbursement, to be used for the sale (the "<u>Sale</u>") of substantially all of the Debtor's assets (the "<u>Purchased Assets</u>"), (b) scheduling the bid deadline, auction date, and sale hearing and approving the form and manner of notice thereof, (c) approving procedures to fix cure amounts related to the assumption, sale and assignment of certain executory contracts and unexpired leases and approving notice thereof, and

(2) following a subsequent hearing (the "<u>Sale Hearing</u>"), entry of an order (the "<u>Sale Order</u>") attached hereto as <u>Exhibit 2</u> approving (a) the sale of the Debtor's Purchased Assets under the Asset Purchase Agreement (the "<u>Purchase Agreement</u>"), attached to the Sale Order as <u>Exhibit A</u>, to Allegro Nutrition LLC (the "<u>Buyer</u>" or "<u>Proposed Buyer</u>"), or to a prevailing bidder (the "<u>Prevailing Bidder</u>") to be determined at the auction, free and clear of Liabilities, encumbrances and other interests of any kind or nature, whether imposed by agreement, understanding, law, equity or otherwise (other than the Assumed Liabilities and the Permitted Encumbrances), (b) if the Proposed Buyer is the Prevailing Bidder, the Purchase Agreement and the obligations incurred by the Debtor and the Proposed Buyer thereunder, (c) the assumption, sale and assignment to the Proposed Buyer, or to the Prevailing Bidder, of certain contracts of the Debtor and (d) granting related relief.

In support of the Motion, the Debtor respectfully state as follows:

## I.

## <u>JURISDICTION AND VENUE</u>

---

[2] Any capitalized terms not defined herein shall have the meanings ascribed to them in the Purchase Agreement (as defined below) or the Bidding Procedures.

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.      Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicate for the relief requested in this Motion is 11 U.S.C. §§ 105(a), 363(b), 363(f), 363(k), 363(m), 365, 503 and 507, Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 6004,  6006 and 9014 and Rule 6004-1 of the District of New Jersey Local Bankruptcy Rules

## II.

## BACKGROUND

4.      On October 14, 2014, the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").  The Debtor continues to operate its business and property as a debtor-in-possession in accordance with Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 Case.

5.      An Official Committee of Unsecured Creditors (the "Committee") has yet to be appointed in this Case, but the Debtor anticipates that the Committee will be appointed in short order.

6.      The factual background relating to the commencement of these Chapter 11 cases is set forth in detail in the *Affidavit of Marc B. Ross, Chief Restructuring Officer of the Debtor In Support of First-Day Motions* (the "Affidavit"), which is incorporated herein.

7.      As set forth more fully in the *Declaration of Marc Ross in Support of First Day Motions and Applications,* the Company is a leading developer and distributor of sports nutrition

supplements.  The Company's products are primarily sold through third party specialty retailers such as The Vitamin Shoppe, through distributors, who sell to smaller sports nutrition retailers, and through specialty on-line retailers like BodyBuilding.com and Amazon.com.  The Company also distributes its product through a proprietary website and directly to consumers through various subscription services.

8.     The Debtor commenced this Chapter 11 case in order to permit the Debtor to conduct a sale of its business as a going concern under section 363 of the Bankruptcy Code.  The effort is supported by the Debtor's prepetition secured lender, Crestmark Bank (the "Crestmark"), which, subject to Court approval, will also be providing postpetition financing.  In July 2014, with the consent if Crestmark, the Debtor retained Heritage Equity Partners ("Heritage") as its investment banker to market the business for such a sale.  Contemporaneously with the filing of this Case, the Debtor has filed an application requesting authority and approval to employ Heritage.  Since Heritage's engagement they and the Debtor's management and counsel have worked diligently to implement and carry out a robust marketing process for the Purchased Assets.  In early August 2014, Heritage created marketing materials and an online virtual data room (the "Data Room") was opened and contained a myriad of due diligence information.  Interested parties that signed a confidentiality agreement ("CA") were given access to the Data Room.  As for the progress of the marketing process, to date, (i) Heritage contacted or has contacted well over 1,000 parties by mail and called more than 175 parties by phone; Heritage has received 59 signed CAs; (ii) 7 interested parties conducted site visits; and (iii) all seven of those groups conducted an interview of the Debtor's management.  Thus, the Debtor believes that it has conducted a full, open and robust marketing process for the Purchased Assets.

9.      The Debtor engaged several interested parties, including the Buyer, in negotiations over potential Letters of Intent ("LOI").  The Debtor received five (5) LOIs from interested parties.  The Debtor and it's advisors commenced negotiations with all of the parties from whom LOIs were received.  Through that process, the Debtor, with the assistance of its advisors, determined that the purchase offer contained in the Proposed Buyer's LOI represented the highest or otherwise best offer and executed the Proposed Buyer's LOI.  The Debtor, it's advisors, the Proposed Buyer and it's advisors immediately commenced negotiations on the Purchase Agreement.  The Purchase Agreement was negotiated in good faith and at arm's length by the Debtor and the Proposed Buyer and their respective, separate professionals.

10.     The Purchase Agreement provides, *inter alia,* for the Proposed Buyer to purchase the Purchased Assets free and clear of Liabilities for approximately $5,000,000.

11.     **In the interests of full disclosure, the Purchase Agreement provides for and incorporates an employment agreement (the "Employment Agreement") by and between the Proposed Buyer and Richard Gaspari.  As set forth in more detail in the Affidavit, Mr. Gaspari is the founder, sole shareholder, sole board member and President of the Debtor. Mr. Gaspari is an integral component of the business and is the "face" of the Debtor's products.  As a result, the Proposed Buyer believes it is necessary to continue Mr. Gaspari's employment with the Company post-Sale, which is reflected by the inclusion of the Employment Agreement in the Purchase Agreement.  It should also be noted that, as reflected in the *Written Consent of Sole Board Member* filed with bankruptcy petition in this Case, that prior to the Petition Date Mr. Gaspari granted ultimate control over the Company to Marc Ross as CRO, which includes, but is not limited to, all matters**

concerning the bankruptcy, the business, the business in the bankruptcy and entry into the

Purchase Agreement with the Proposed Buyer.

**III.**

**RELIEF REQUESTED**

12.     This Motion seeks relief in two parts.  First, the Motion seeks approval of various

procedures relating to the proposed Sale and the scheduling of the Sale Hearing.  Second, the

Motion seeks approval of the proposed Sale and related transactions following the conclusion of

the Sale Hearing.

### A.     Bidding Procedures

13.     After extensive arm's length negotiations, the Debtor and the Proposed Buyer

executed the Purchase Agreement.  The hearing to seek approval of the order approving the

Bidding Procedures is intended to, among other things, approve the Proposed Buyer as the

"stalking horse" bidder in connection with the Debtor's solicitation of higher and better offers for

the Purchased Assets, establish the form and manner of notice of the Sale and establish the

Bidding Procedures by which other parties may participate in the Auction.  A copy of the

proposed Bidding Procedures the Debtor seeks to have approved are set forth in Exhibit A to the

Bidding Procedures Order, which is attached hereto as Exhibit 1.

### B.     Proposed Notice Procedures

14.     The Debtor will cause to be served, within five (5) business days after issuance of

the Bidding Procedures Order, by first-class mail, postage prepaid, (i) notice of the Bid Deadline,

Auction and Sale Hearing substantially in the form annexed to the Bidding Procedures Order as

Exhibit B (the "Notice of Bid Deadline, Auction, and Sale Hearing"), (ii) the Bidding Procedures

Order including the Bidding Procedures attached thereto as Exhibit A and (iii) this Motion (the

Notice of Bid Deadline, Auction, and Sale Hearing, this Order and the Bidding Procedures, the

Motion, collectively, the "Sale Package"), upon: (a) all potential buyers previously identified or

solicited by the Debtor and any additional parties who have previously expressed an interest in

potentially acquiring the Purchased Assets, (b) all other potentially interested parties identified

by the Debtor or its advisors; (c) the Office of the United States Trustee, (d) counsel for the

Proposed Buyer, (e) all of the Debtor's known creditors, (f) all parties in interest who have

requested notice under Bankruptcy Rule 2002, (g) the Sale Objection Notice Parties (defined

below), (h) all parties who are known to possess or assert a lien, claim, encumbrance or interest

in or upon any of the Purchased Assets, including Crestmark Bank, and (i) all applicable federal,

state and local regulatory or taxing authorities or recording offices which are known by the

Debtor to have an interest in the relief requested in the Motion.  Due to the size and complexity

of this matter, only those parties in (a) - (d) and (f) - (i) will be sent the Sale Package.  Those

parties in (e) will receive only the Notice of Bid Deadline, Auction, and Sale Hearing.

15.    In addition, the Debtor also seeks approval of the following procedures with

respect to the assumption and assignment of Assigned Contracts (if any):

a.    The Debtor shall send notice within five business days of the date of the

issuance of the Bidding Procedures Order substantially in the form annexed to the

Bidding Procedures Order as Exhibit C (the "Notice of Assumption and Assignment") to

all non-Debtor counter-parties to the Assigned Contracts.  The Notice of Assumption and

Assignment shall set forth (i) that such Assigned Contract may be assumed by the Debtor

and assigned to the Proposed Buyer or, alternatively, to the Prevailing Bidder under the

Bidding Procedures and (ii) the Cure Amount associated with the assumption and

assignment of such Assigned Contract.  Upon receipt of any Qualified Bid submitted by a

Qualified Bidder, the Debtor shall promptly determine whether a Notice of Assumption

and Assignment needs to be given to any additional non-Debtor parties to Assigned

Contracts that are listed on any schedule of Assigned Contracts to be assumed and

assigned submitted by such Qualified Bidders and shall mail, or otherwise serve by

overnight courier service or other prompt method of service, within two (2) business days

of receipt of such Qualified Bid, such additional Notices of Assumption and Assignment

as may be required.  A counterparty to an Assigned Contract which the Proposed Buyer

has designated for assumption and assignment which later receives a notice that a rival

Qualified Bidder has also designated that Contract for assumption and assignment may

object as set forth in subparagraphs b. and e., below.

      b.      All objections to the assumption, sale and assignment of any Assigned

Contract or to any Cure Amount (each, an "<u>Assumption and/or Cure Objection</u>") must be

filed with the Court and served upon the Objection Notice Parties so as to be actually

received no later than the Sale Objection Deadline.   All Assumption and/or Cure

Objections must state with specificity the nature of such objection and may be heard by

the Court at the Sale Hearing or such other date and time as the Debtor may schedule

with the Court.

      c.      If an objection timely filed and served in accordance with sub-paragraph

b. above challenges a Cure Amount, such objection must set forth the amount of cure

being claimed by the objecting party (the "<u>Claimed Cure Amount</u>") with appropriate

documentation in support thereof.

      d.      If no objection to the Cure Amount or the proposed assumption, sale and

assignment in respect of an Assigned Contract is timely filed and served:  (i) the Debtor

may assume, sell and assign to the Proposed Buyer such Assigned Contracts, or alternatively, to the Prevailing Bidder, (ii) the Cure Amount set forth in the Notice of Assumption and Assignment shall be binding upon the respective non-Debtor party to the Assigned Contract for all purposes in this Case, and (iii) the respective non-Debtor party shall be forever barred from objecting to the assumption, sale and assignment of the relevant Assigned Contract and/or Cure Amount, and from asserting against the Debtor or the Proposed Buyer (or, if applicable, another Prevailing Bidder) any right of setoff, condition to assignment and/or any additional cure or other amount with respect to such Assigned Contract.

e.       In the event the Proposed Buyer is not the Prevailing Bidder, non-Debtor parties to the Assigned Contracts may raise objections to adequate assurance of future performance under the Assigned Contracts at the Sale Hearing.  Any objection to the assumption, sale and assignment to the Proposed Buyer of any Assumed Contracts on grounds of lack of adequate assurance of future performance shall be raised in a timely objection to the Sale filed with the Court and served on the parties in accordance with paragraph b. above.

f.       The effective date of any assumption, sale and assignment of any Assigned Contract shall be the Closing (as defined in Section 1.05 of the Purchase Agreement).  Accordingly, any Cure Amounts to be paid under any Assigned Contract shall be paid by the Debtor upon or as soon as reasonably practicable after the Closing Date or as soon thereafter as the Cure Amount is fixed by the Court or agreed upon by the Debtor and the objecting party.

16.     To be considered by the Court, any objections to the Sale of the Purchased Assets to the Proposed Buyer or the Prevailing Bidder or to the Purchase Agreement shall (a) be in writing, (b) conform to the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objecting party, the nature and amount of any claims or interest held or asserted against the Debtor's estate or their properties, the basis for the objection and the specific grounds therefor and (d) be filed with the Court and served on the following (collectively, the "Objection Notice Parties") (i) the United States Trustee; (ii) counsel for the Debtor, Fox Rothschild LLP, 1301 Atlantic Avenue, Midtown Building, Suite 400, Atlantic City, NJ 08401-7212, Attention: Michal J. Viscount, Jr., Esq. & 2000 Market Street, 20th Floor, Philadelphia, PA 19103, Attention: Joshua T. Klein, Esq.; (iii) Counsel for Crestmark Bank, Jaffe Raitt Heuer & Weiss, P.C., 27777 Franklin Road, Suite 2500, Southfield, MI 48034, Attention: Thomas E. Coughlin, Esq. (iv) counsel for the Committee, and (v) counsel for the Proposed Buyer, Day Pitney LLP, One International Place, Boston, MA 02110, Attention: Daniel J. Carragher, Esq. and One Jefferson Road, Parsippany, NJ 07054-Attention: Margarita Y. Ginzburg, Esq.

17.     The Debtor requests that any entity that fails to file and serve its objection before the expiration of the Sale Objection Deadline and otherwise in accordance with the Bidding Procedures Order shall be prohibited from asserting at the Sale Hearing or at any time thereafter any objection to the Motion or the consummation and performance of the Sale as contemplated by the terms of the Purchase Agreement (or by the terms of the purchase agreement submitted by the Prevailing Bidder), including the transfer of the Purchased Assets free and clear of all Liabilities, encumbrances and other interests of any kind or nature, whether imposed by agreement, understanding, law, equity or otherwise (other than Assumed Liabilities and Permitted Encumbrances).

C.    **Stalking Horse Bid Protections**

18.    To induce the Proposed Buyer to expend the time, energy and resources necessary to submit a stalking horse bid, the Debtor has agreed to provide, and to seek this Court's approval of, certain bid protections provided to the Proposed Buyer under the Purchase Agreement.  In particular, the Debtor has agreed to provide the Proposed Buyer a break-up fee in the amount of $125,000.00USD (equal to 2.5%) (the "Break-up Fee"), as well as an expense reimbursement not to exceed $120,000.00USD (the "Expense Reimbursement").  In addition, the Bidding Procedures relating to a possible credit bid by Crestmark require that any such credit bid include a cash component sufficient to enable the Debtor to pay the Break-up Fee and the Expense Reimbursement from the proceeds of a sale to Crestmark.  This Break-up Fee and Expense Reimbursement, and the circumstances in which they be paid, have been heavily negotiated by the Debtor and the Proposed Buyer.

19.    As set forth in paragraph 7.03 of the Purchase Agreement, the Proposed Buyer is entitled to be paid the Break-up Fee and Expense Reimbursement if the Bankruptcy Court approves any agreement for a transaction or a series of related transactions, other than the transactions to be consummated under the Purchase Agreement, pursuant to which the Purchase Assets will be acquired by another party, including a purchase by Crestmark via a credit bid (an "Alternative Transaction").

20.    The Debtor requests that the Break-up Fee and Expense Reimbursement be payable as allowed administrative expenses arising in these Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code and either (i) be paid directly from the Sale proceeds before any part thereof is distributed to pay other parties in interest or (ii) in the event of a credit bid by the DIP Lender, be paid by Crestmark, as a required cash consideration component of the credit

bid, and a requirement to this effect is made a part of the Bidding Procedures for which approval

is sought.

21.     The Break-up Fee and Expense Reimbursement are material inducements for, and

conditions of, the Proposed Buyer's execution of the Purchase Agreement.  The Debtor believes

that the Break-up Fee and Expense Reimbursement are fair and reasonable in view of, among

other things, (a) the intensive analysis, due diligence and negotiations undertaken by the

Proposed Buyer in connection with the Sale, (b) the fact that, if the Break-up Fee and Expense

Reimbursement are triggered, the Proposed Buyer's efforts will have increased the highest or

otherwise best offer for the Purchased Assets, to the benefit of the Debtor's estate, and (c) the

amount of the Break-up Fee and Expense Reimbursement are within the normal range for such

provisions in courts throughout the Third Circuit.

### D.      Approval of Sale

22.     The Debtor requests that at the conclusion of the Sale Hearing, that the Court

enter the Sale Order approving the proposed sale of the Purchased Assets, free and clear of liens,

claims, interests, and liabilities in accordance with the terms and conditions contained in the

Purchase Agreement to the Proposed Buyer, or another Prevailing Bidder, authorizing the

assumption and assignment of certain executory contracts and unexpired leases in accordance

with the Purchase Agreement, and granting such other relief as is necessary to effectuate the

transactions contemplated by the Purchase Agreement.

23.     The Debtor also requests that the Court waive the ten day stay that otherwise may

be applicable under Bankruptcy Rules 6004(h) and 6006(d), so that the Bidding Procedures

Order and the Sale Order are effective immediately upon entry.

### IV.

## BASIS FOR RELIEF REQUESTED

24.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtor has determined that a sale of the Purchased Assets to the Proposed Buyer pursuant to the Purchase Agreement, subject to a process in which parties may make qualifying overbids and participate in an open auction, will enable the Debtor to obtain the most consideration possible for the Purchased Assets, for the benefit of the Debtor's estate.  The proposed Bidding Procedures will facilitate that objective.

### A.     The Proposed Bidding Procedures Are Reasonable And Appropriate

25.     The courts have made clear that a debtor or trustee's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See, e.g., In re Integrated Resources, Inc.,* 147 B.R, 650, 656-57 (Bankr. S.D.N.Y. 1992).  The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *In re Food Barn Stores, Inc.,* 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand."); *Integrated Resources,* 147 B.R. at 659 (same); *In re Atlanta Packaging Products, Inc.,* 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988) (same).  In that regard, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., In re Montgomery Ward Holding Corp.,* Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6,1997); *In re Fruehauf Trailer Corp.,* Case No. 96-LS63 (PJW) (Bankr. D. Del. Feb. 26,1997); *Integrated Resources,* 147 B.R. at 659.

26.     The proposed Bidding Procedures will allow the Debtor to consider qualified overbids for the Purchased Assets and, if it receives such overbids, to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially able bidders who demonstrate the ability to close a transaction.  This will increase the likelihood that the Debtor will receive the greatest possible consideration for the Purchased Assets.  The Bidding Procedures also set forth a schedule for achieving these objectives in an expeditious manner, balancing the Debtor's desire to maximize recovery for the benefit of the Debtor's estate, with providing Potential Bidders a fair and reasonable opportunity to submit Qualified Bids.

27.     With respect to the Break-up Fee and Expense Reimbursement components of the proposed Bid Procedures, the United States Court of Appeals for the Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context.  In *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999), the Court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some post-petition benefit to the debtor's estate.  *Id.* at 533.

28.     The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id.* at 537.  Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have

provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

29.      In this case, the amount of the Break-up Fee (2.5% of the Purchase Price) is reasonable and appropriate in light of the size and nature of the transactions and the efforts that have been and will be expended by the Proposed Buyer as the stalking horse bidder.   In addition, the Break-up Fee will enable the Debtor to secure an adequate floor, and, thus, insist that competing bids be higher or otherwise better than the terms of the Purchase Agreement, a clear benefit to the Debtor's estate.   The Proposed Buyer is not entitled to the Break-up Fee and Expense Reimbursement unless this Court approves an Alternative Transaction and it closes. Accordingly, the Debtor's estate will not be diminished by payment of the Break-up Fee and Expense Reimbursement, because the necessary funds will be derived from the higher and better Alternative Transaction.   Break-up fees and expense reimbursements are routinely approved in these types of circumstances.  *See, e.g., In re Fruit of the Loom, Inc.,* Case No. 99-4497 (PJW) (Bankr. D. Del. 1999) (break-up fee and expense reimbursement equal to 3.59%); *In re Graham Field Health Products, Inc.,* Case No. 99-4457 (MFW) (Bankr. D. Del. 1999) (break-up fee and expense reimbursement equal to 4.65%).

30.      For these reasons, the Debtor requests that the Court (i) authorize the Bidding Procedures and (ii) approve and authorize the payment of the Break-up Fee and the Expense Reimbursement, each as an administrative expense of the Debtor's estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code, on the terms and conditions set forth in the Purchase Agreement and the Bidding Procedures, including the requirement that Crestmark include cash consideration as part of a credit bid sufficient to fully fund the amounts due to the Proposed

Buyer for the Break-up Fee and Expense Reimbursment, be paid directly from the Sale proceeds before any part thereof is distributed to pay other parties in interest.

**B.      The Sale Of The Purchased Assets Pursuant To The Purchase Agreement Is Authorized By Section 363(b) Of The Bankruptcy Code**

31.      Section 363(b)(1) of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363(b)(1).  Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this District have required that such use, sale or lease be based upon a debtor's sound business judgment of the debtor.  *See, e.g., In re Decora Indus., Inc.,* 2002 WL 32332749, *2 (D. Del. May 20, 2002); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991); *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (Bankr. D. Del. 1999).  Courts in other circuits are in accord. *See, e.g., In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983).

32.      The business judgment rule shields a debtor's management from judicial second-guessing.  *See In re Johns-Manville Corp.,* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").  Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the [debtor] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the [estate].'"  *Integrated Resources,* 147 B.R. at 656 (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)).

33.      Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).  When applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See In re First*

*Wellington Canyon Assocs.,* 1989 U.S. Dist. LEXIS 10687 at *8-*9 (N.D. Ill. Sept. 8, 1989)

("Under this test, the debtor's business judgment ... must be accorded deference unless shown

that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained

discretion."); *In re Trans World Airlines, Inc.,* 2001 Bankr. LEXIS 267 at *45-*50 (Bankr. D.

Del. Mar. 12, 2001) (describing business judgment rule as "very deferential standard").

34.    The Debtor has amply demonstrated sound business judgment in entering into the

Purchase Agreement, which provides for a sale of substantially all of the Debtor's assets.  The

prompt sale of the Purchased Assets present the best opportunity to maximize the value for the

estate.  Pursuant to the Purchase Agreement, or a similar such agreement from a Qualified

Bidder, the Prevailing Bidder will provide substantial consideration to the Debtor's estate.  The

current bid of the Proposed Buyer is comprised of total cash consideration of approximately

$5,000,000USD.    As  of  the  Petition  Date,  the  Debtor's  consolidated  liabilities  were

approximately $16 millionUSD.  Accordingly, the value to be obtained by the Debtor's estate

through this process is significant and should bring about a meaningful result for the Debtor's

stakeholders. The Debtor submits that the proposed Auction and Sale satisfies the business

judgment test.

35.    In addition, based on its extensive marketing efforts, the Debtor submits that the

consideration to be paid by the Proposed Buyer under the Purchase Agreement is fair and

reasonable.  The fairness and reasonableness of the consideration to be paid for the Debtor's

assets by the Proposed Buyer, or by such other Prevailing Bidder that may be approved at the

Sale Hearing, will be conclusively demonstrated by the exposure of the opportunity to the

marketplace.  As noted, the Heritage actively marketed this opportunity prior to the Petition Date

and will continue with the active marketing of the opportunity after approval of the Bidding

Procedures.  Ultimately, if no party offers consideration that materially exceeds the consideration to be provided by the Proposed Buyer, on substantially similar terms as are set forth in the Purchase Agreement, it will be clear that the consideration being paid by the Proposed Buyer is the best available.  Likewise, if another party successfully overbids and becomes the Prevailing Bidder, it will be clear that the consideration being given by such Prevailing Bidder is the best available.  The Debtor has proposed a fair and open process for achieving these objectives, irrespective of which entity ultimately acquires the Purchased Assets.  Thus, the additional market check to be provided through the auction process will demonstrate the fairness and reasonableness of the consideration being received.

36.     The decision to sell substantially all of the assets of the Debtor pursuant to a sale under section 363 of the Bankruptcy Code, rather than under a chapter 11 plan, is likewise an exercise of sound business judgment under the circumstances.  The Debtor submits that the stability of the Debtor's business and the value that would be realized for stakeholders would be seriously jeopardized by the extended stay necessary to effectuate this transaction under a chapter 11 plan.  For similar reasons, the Debtor believes that the existence of the Employment Agreement (disclosed above in paragraph 11) does not negatively affect the proposed Sale to the Proposed Buyer.  On the contrary, the Employment Agreement is a necessary component of the Purchase Agreement and the Sale – to any Buyer.  As set forth previously, Mr. Gaspari is the founder and "face" of the Debtor's business and is an integral part of the business going forward, regardless of Company ownership.

37.     For all of these reasons, the Debtor has determined that its best if not only viable opportunity to maximize stakeholder recoveries is to sell substantially all of their assets as a

going concern.  Accordingly, it is a valid exercise of the Debtor's business judgment to seek

approval of the Bidding Procedures, the Break-up Fee and Expense Reimbursement and the Sale.

**C.      The Sale Of The Purchased Assets Free and Clear of Liabilities and Other Interests is Appropriate and Necessary**

38.      The Debtor respectfully submits that it is appropriate to sell the Purchased Assets

free and clear of liens, claims, liabilities and interests pursuant to section 363(f) of the

Bankruptcy Code, with any such liens, claims, liabilities or interests attaching to the net Sale

proceeds of the Purchased Assets to the extent applicable.  Section 363(f) of the Bankruptcy

Code authorizes a debtor to sell assets free and clear of liens, claims, liabilities and interests if:

A.      applicable nonbankruptcy law permits sale of such property free and clear of such interests;

B.      such entity consents;

C.      such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

D.      such interest is in bona fide dispute; or

E.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by Section 105(a) of the Bankruptcy Code,

which provides that "[t]he Court may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

39.      Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive,

satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased

Assets "free and clear" of liens and interests.  *In re Dundee Equity Corp.,* 1992 Bankr. LEXIS

436, *12 (Bankr. S.D.N.Y. Mar. 6,1992) ("Section 363(f) is in the disjunctive, such that the sale

free of the interest concerned may occur if any one of the conditions of § 363(f) have been

met."); *In re Wolverine Radio Co.,* 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Section 363(f) of the Bankruptcy Code is met).

40.     The Debtor is only aware of one party that has asserted a lien on any of the Debtor's assets – Crestmark, the Debtor's prepetition and postpetition secured lender.   However, the Debtor believes that one or more of the tests of Section 363(f) will be satisfied with respect to the transfer of the Purchased Assets pursuant to the Purchase Agreement with respect to the liens of Crestmark and any other lienholders that may exist.   In particular, Crestmark or any other lien holders will be adequately protected by having their liens against the Debtor or its estate, attach to the cash proceeds of the Purchased Assets in which Crestmark (or such other secured creditor) alleges an interest, in the same order of priority, with the same validity, force and effect that Crestmark (or such other secured creditor) had prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto (other than with respect to the claim of Crestmark).   Accordingly, section 363(f) authorizes the transfer and conveyance of the Purchased Assets free and clear of any such claims, interests, liabilities or liens.

41.     The Debtor also satisfies other subsections of section 363(f).   Crestmark has consented to the Sale, therefore section 363(f)(2) has been satisfied.   Furthermore, the Debtor also satisfies section 363(f)(5) because Crestmark and all parties entitled to assert liens, claims, liabilities or interests can be compelled under state law to accept a money satisfaction of their interests.   Accordingly, the Debtor requests that the Purchased Assets be transferred to the Proposed Buyer (or the Prevailing Bidder) free and clear of all Liabilities, encumbrances and

other interests of any kind or nature, whether imposed by agreement, understanding, law, equity

or otherwise (other than Assumed Liabilities and Permitted Encumbrances).

### D.    The Purchased Assets Should Be Sold Free And Clear Of Successor Liability

42.    Under the Purchase Agreement, the Proposed Buyer is assuming only those

Assumed Liabilities expressly set forth therein.  The Proposed Buyer, therefore, should not be

liable for any of the Debtor's liabilities in connection with the Sale of the Purchased Assets as a

successor to the Debtor's business or otherwise, unless expressly assumed.  Extensive case law

exists providing that claims against buyer are directed to the proceeds of a free and clear sale of

property and may not be asserted against a buyer subsequently.

43.    Courts have consistently held that a buyer of a debtor's assets pursuant to a

section 363 sale takes free from successor liability resulting from pre-existing claims.  *See Ninth

Ave. Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (N.D. Ind. 1996) (stating that a

bankruptcy court has the power to sell assets free and clear of any interest that could be brought

against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp.*

(*In re Johns-Manville Corp.*), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to

proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy

Code); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of

property in free and clear sale included free and clear of Title VII employment discrimination

and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I.

1985) (transfer of liquor license free and clear of any interest permissible even though the estate

had unpaid taxes); *American Living Sys. V. Bonapfel* (*In re All Am. Of Ashburn, Inc.*), 56 B.R.

186, 190 (Bankr. N.D. GA 1986) (product liability claims precluded on successor doctrine in a

sale of assets free and clear); *WBQ P'ship v. Virginia Dept. of Med. Assistance Servs.* (*In re*

*WBQ P'ship*), 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right

to recapture depreciation is an "interest" as used in section 363(f)).[3]

44.     The purpose of an order purporting to authorize the transfer of assets free and

clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis

to assert claims against the Proposed Buyer (or Prevailing Bidder) arising from the Debtor's pre-

Sale conduct.   Under section 363(f) of the Bankruptcy Code, the Proposed Buyer (or Prevailing

Bidder) is entitled to know that the Purchased Assets are not infected with latent claims that will

be asserted against the Proposed Buyer (or Prevailing Bidder) after the proposed transaction is

completed.

45.     Accordingly, consistent with the above-cited case law, the Sale Order approving

the sale of the Purchased Assets should state that the Proposed Buyer (or Prevailing Bidder) is

not liable as a successor under any theory of successor liability, for claims that encumber or

relate to the Purchased Assets, including, without limitation, any Liabilities arising under a

theory of successor liability.

**E.      The Prevailing Bidder Is A Good Faith Purchaser And Is Entitled To The
Full Protections Of Section 363(m) Of The Bankruptcy Code**

46.     The Debtor requests that the Court find that the Proposed Buyer (or the Prevailing

Bidder) is entitled to the full protections of Section 363(m) Bankruptcy Code.   Courts have

indicated that a party would have to show fraud or collusion between the buyer and the debtor in

possession or trustee or other bidders in order to demonstrate a lack of good faith.   *See In re*

*Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would

---

[3] Even courts concluding that Bankruptcy Code section 363(f) does not empower them to convey assets
free and clear of claims have nevertheless found that Bankruptcy Code section 105(a) provides such
authority.  *See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit
Corp.)*, 75 B.R. 944, 948 (Bankr N.D. Ohio 1987) (stating that the absence of specific authority to sell

destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *See also In re Angelika Films 57th, Inc.,* 1997 U.S. Dist. LEXIS 7463 at *19-*28 (S.D.N.Y. May 29, 1997).

47.     Courts repeatedly have concluded that the sale of a debtor's principal assets and/or substantially all of its assets is appropriate where there are sound business reasons and no evidence of fraud or collusion.  *See In re Abbotts Dairies of Penn., Inc.,* 788 F.2d 143 (3rd Cir. 1986) (sale of all assets appropriate where purchaser acted in good faith, and there was no fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders); *In re Trans World Airlines, Inc.* 2001 Bankr. LEXIS 980 (Banks. Del. 2001) (citing *Abbotts Dairies*); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 178-79 (D. Del. 1991).[4]  As discussed, there is ample business justification for the proposed sale of substantially all of the Debtor's assets, the Sale and the Purchase Agreement have been pursued in good faith, and there has been no fraud or collusion between the Debtor and the Proposed Buyer.   In addition, the Purchase Agreement is the product of extensive, and often intense, arm's length negotiations with complete disclosure having been made of the Proposed

_____

assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

[4] *See also In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983) (sale of estate's most significant asset justified where supported by sound business reasons); *Stephens Industries, Inc. v. McClung,* 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"); *In re Coastal Industries, Inc.,* 63 B.R. 361 (Banks. N.D. Ohio 1986); *In re Apex Oil Comp.,* 92 B.R. 847 (Banks. E.D. Mo. 1988) (applying the "fair and reasonable" test to the sale of substantially all assets under section 363 and finding that the debtor articulated sufficient business reasons for approval of sale); *In re Charlesbank Laundry Co.,* 37 B.R. 20 (Banks. D. Mass. 1983) ("A sale of all assets in Chapter 11 *is* appropriate if the provisions of 11 U.S.C. Section 363 are followed, the bid is fair and reasonable and the sale is in the best interests of the estate and creditors"); *In re Ancor Exploration Comp.,* 30 B.R. 802 (Banks. N.D. Okla. 1983) ("conclud[ing] the bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under §363(b). However, each such proposed sale must be examined from its own facts to determine whether approval is justified").

Buyer's relation to the Debtor and the extensive marketing by the Debtor and its professionals to find a different stalking horse.

48.     Further, the Proposed Buyer has recognized that the Debtor is free to deal with any other party interested in acquiring the Purchased Assets.  At the Sale Hearing, the Debtor will be able to demonstrate that the Proposed Buyer has also complied with the Bidding Procedures Order and agreed to subject its bid to the competitive Bidding Procedures.  Additionally, all payments to be made to the Proposed Buyer and other agreements or arrangements entered into by the Proposed Buyer in connection with the Sale will have been disclosed.

49.     In this case, there is absolutely no indication of fraud or improper inside dealing of any kind.  The Purchase Agreement does not constitute an avoidable transaction pursuant to section 363(n) and the Buyer should receive the protections afforded good faith purchasers under section 363(m).  Accordingly, the Debtor requests that this Court make a finding at the Sale Hearing that the Purchase Agreement executed by the Proposed Buyer was at arm's length and entitled to the full protections of Section 363(m).

50.     In the event a purchaser other than the Proposed Buyer is a Prevailing Bidder, the terms and conditions of the alternate agreement will be negotiated by the Debtor and the purchaser at arm's length and in good faith.  In the event such alternate purchaser is the Prevailing Bidder at the auction, the Debtor intends to offer evidence at the Sale Hearing to show that such Prevailing Bidder is entitled to section 363(m) protection.

**F.     The Court Should Approve The Assumption, Assignment And Sale Of The Executory Contracts And Unexpired Leases Identified In The Asset Purchase Agreement.**

51.     Section 365(a) of the Bankruptcy Code provides that the [debtor in possession], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." *See* 11 U.S.C. § 365(a).  Although the Bankruptcy Code does not itself set forth guidelines for courts to apply in determining whether to approve the decision of a debtor to assume or reject an executory contract or unexpired lease, the overwhelming majority of courts have consistently applied the well-established "business judgment" test. *See, e.g., Group of Institutional Investors v. Chicago M. St. P. & Pac. R.R.,* 318 U.S. 523, 550; 63 S. Ct. 727, 742¬43 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.),* 872 F.2d 36, 39-40 (3d Cir. 1989); *Robertson v. Pierce (In re Chi-Feng Huang),* 23 B.R. 798, 800 (B.A.P. 9th Cir. 1982); *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1309 (5th Cir. 1985); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1046-47 (4th Cir. 1985), *cert. denied,* 475 U.S. 1057 (1986); *Control Data Corp. v. Zelman (In re Minges),* 602 F.2d 38, 43 (2d Cir. 1979); *Carey v. Mobil Oil Corp. (In re Tilco, Inc.),* 558 F.2d 1369, 1372 (10th Cir. 1977).

52.     In applying the business judgment standard, courts show great deference to the debtor's decisions to assume or reject. *See, e.g., NRLB v. Bildisco & Bildisco,* 462 U.S. at 523 (1984); *In re Federal Mogul Global, Inc.,* 293 B.R. 124, 126 (D. Del. 2003).  A trustee or debtor in possession satisfies the "business judgment" test when it decides, in good faith, that assumption or rejection may benefit the estate. *In re Federal Mogul Global, Inc.,* 293 B.R. at 126; In re FCX, Inc., 60 B.R. 405, 411 (E.D.N.C. 1986); *In re Chipwich, Inc.,* 54 B.R. 427, 430¬31 (Bankr. S.D.N.Y. 1985); *Commercial Fin. Ltd. v. Hawaii Dimensions (In re Hawaii Dimensions),* 47 B.R. 425, 427 (Bankr. D. Haw. 1985).  Bankruptcy courts thus generally approve a debtor in possession's decision to assume or reject unless there is: (i) a showing of bad

faith or abuse of discretion; or (ii) a clear demonstration that assumption or rejection will not benefit the estate or creditors. *In re Federal Mogul Global, Inc.,* at 126 (D. Del. 2003) (court should approve a debtor's decision to reject a contract unless that decision is the product of bad faith or a gross abuse of discretion); *In re FCX, Inc.,* 60 B.R. at 411; *In re Chipwich, Inc.,* 54 B.R. at 430-31.

53.    In *Summit Land Co. v. Allen (In re Summit Land Co.),* 13 B.R. 310 (Bankr. D. Utah 1981), the bankruptcy court explained why such deference is given to the debtor in possession's assumption or rejection decisions:

> [C]ourt approval under section 365(a), if required, except in extraordinary situations, should be granted as a matter of course. To begin, this rule places responsibility for administering the estate with the debtor in possession], not the court, and therefore furthers the policy of judicial independence considered vital by the authors of the Code. Second, this rule expedites the administration of estates, another goal of the Bankruptcy Reform Act. Third, the rule encourages rehabilitation by permitting the replacement of marginal with profitable business arrangements. Fourth, the rule is supported by pre-Code cases in this Circuit.

*Id.* at 315.

54.    Here, the Debtor has amply demonstrated sound business judgment in entering into the Purchase Agreement, which provides for the assumption and assignment of certain contracts and leases. As discussed above, the Assigned Contracts will be assigned in conjunction with the sale of substantially all of the Debtor's assets, pursuant to a transaction that will provide significant consideration to the estate.

55.    Where any of the contracts may be in default, the Debtor must cure, or provide adequate assurance of a prompt cure, of any defaults thereunder and provide adequate assurance of future performance under the contract. 11 U.S.C. § 365(b)(1). The requirements of section 365(b)(1) will be fully satisfied in this case. As set forth in the proposed contract procedures

above, the Debtor will provide notice to the non-Debtor parties to the Assigned Contracts of the Debtor's calculation of the Cure Amounts owing thereunder, if any, and the non-Debtor parties will have an opportunity to object.  Under the Purchase Agreement, any cure amounts owed to non-Debtor counterparties will be paid either at Closing by the Debtor from the Sale proceeds, or to the extent that the Debtor and the counterparty do not agree on the amount necessary to cure defaults prior to closing (so long as such counterparty shall have filed a written objection prior to the deadline setting forth the amount it believes is owed to cure any defaults), at a later date from proceeds of the Sale.  The Proposed Buyer also has the right to not have a contract assumed and assigned to it and to have the Debtor reject such contract(s) under certain provisions of the Purchase Agreement.

### 1.      The Assignment Of The Contracts Is Reasonable And Appropriate

56.      Pursuant to this Motion, the Company seeks authority to assign and sell to the Proposed Buyer or the Prevailing Bidder all of the Assigned Contracts pursuant to the Purchase Agreement.  Section 365(f)(2) of the Bankruptcy Code provides the authority for the Debtor to do so:

> The [debtor in possession] may assign an executory contract or executory lease of the debtor only if -
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section [section 365(b)(1)]; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

*See* 11 U.S.C. § 365(f)(1).

57.      Whether an assignee has provided "adequate assurance of future performance" depends upon the facts and circumstances presented.  *See, e.g., In re Evelyn Burns, Inc.,* 32 B.R. 825, 829 (Bank. S.D.N.Y. 1983).  In this case, the Debtor believes that the Proposed Buyer will

be able to demonstrate adequate assurance of future performance. The Proposed Buyer has the financial wherewithal, credibility, willingness and ability to perform under any contract assumed and assigned to it. The Debtor anticipates, moreover, that any entity that qualifies as a Qualified Bidder likewise will have the wherewithal to satisfy the Cure Amounts and perform going forward.

> **2.**     **Assignment Permitted Under Section 365(f), Notwithstanding Anti-Assignment Provisions**

58.     To assist in the assumption, assignment and sale of the Assigned Contracts, the Debtor also requests that the Court enter an order providing that anti-assignment provisions in the Assigned Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

59.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1).

60.     Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), *cert denied*, 522 U.S. 1148 (1998). Section 365(f)(3) goes beyond the scope of

section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

61.      Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Centers, Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.")  Similarly, in *In re Mr. Grocer, Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).   Thus, the Debtor requests that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

**H.     Relief Under Bankruptcy Rules 6004(h) And 6006(d) Is Appropriate**

62.     Bankruptcy Rule 6004(h) provides that an order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Also, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).  The Debtor requests that any order approving the proposed Purchase Agreement (or the Bidding Procedures in connection with the sale proposed thereunder) be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

63.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Lawrence P. King, *Collier on Bankruptcy,* 6004.10 (16th ed.).  Collier further provides that if an objection is filed and overruled, and the objecting party inform the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay, unless the court determines that the need to proceed sooner outweighs the interests of the objecting party. *Id.*

64.     To maximize the value received for the Purchased Assets, the Debtor seeks to have the Closing for the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtor hereby requests that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and

6006(d) or, in the alternative, if an objection to the Sale is filed and upheld by the Court, reduce the stay period to the minimum amount of time needed by the objecting party to seek a stay pending appeal.

## V.

## NOTICE

65.     No trustee or examiner has been appointed in this Case.  The Debtor has served notice of this Motion on (i) the Office of the United States Trustee; (ii) counsel for Crestmark; (iii) counsel for the Proposed Buyer; (iv) all creditors; (v) each non-Debtor party to the Debtor's executory contracts; (vi) any parties that previously expressed an interest in acquiring the Purchased Assets; and (vii) any parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests that the Court enter the Bidding Procedures Order attached hereto as <u>Exhibit 1</u> and, following the subsequent Sale Hearing, enter the Sale Order attached hereto as <u>Exhibit 2</u>, and grant such other relief as this Court deems proper and just.

DATED:  October 14, 2014        **FOX ROTHSCHILD LLP**
                                (Formed in the Commonwealth of Pennsylvania)

                                *Proposed Counsel for Debtor and Debtor-in-Possession*


                                By:    /s/ *Joshua T. Klein, Esquire*
                                        Michael J. Viscount, Jr., Esquire
                                        Joshua T. Klein, Esquire
                                        Marie C. Dooley, Esquire
                                        John H. Strock, Esquire